PTAB's decision in validating the 307 patent should be reversed for at least two significant reasons. First, the PTAB lacked substantial evidence for concluding that there was no evidence of secondary considerations of non-obviousness. Neuro and Cardiac submitted evidence, one, that there was long felt an unresolved need for the inventions of the 307 application. Additionally, Neuro and Cardiac submitted evidence that the commercial success of products infringing the 307 patent had a nexus with the concepts here. And second, PTAB's decision should be reversed because one of ordinary skill in the art would not have a motivation to combine Meadows and Rutecki. As I will explain a little bit later, the substantial differences in the therapies of the 307 patent. I'm sorry. Tell me if I'm wrong in this understanding. I thought what we borrowed from Meadows was the kind of multi-program feature. How does that have anything to do with whether what you're stimulating is the spine or the vagus nerve? You are correct, Your Honor, in that the element taken from Meadows is really the multiple prepackaged programs and applied to Rutecki's vagus nerve stimulation system. Now, it's not merely, our argument at least, is not merely that you can't take a spinal cord stimulation apparatus and then change the leads and apply it to vagus nerve stimulation. It's more that because of the significant differences in how these work, that the number of prepackaged programs, at least at the time of these prior references, pointed away from using multiple prepackaged programs, and that comes from Rutecki, and Rutecki talks about how once the implantable pulse generator is programmed, it continues to operate using that single program until the patient returns to the physician, and the physician or a technician under the control of the physician reprograms the pulse generator. But the problem is, Meadows isn't limited to the SCS treatment, right? So, Your Honor, in the background of the invention for Meadows, it mentions that the teachings of that application can be applied to different manners of neuromodulation than actually in the specification. It mentions that the methods may be applied to different types of neuromodulation, but nothing in the specification of Meadows says, or even suggests to one of ordinary skill in the art, that you would apply it to vagal nerve stimulation. And as neurocardiac expert Dr. Ladd testified, one of ordinary skill in the art would not do that because, so the vagal nerve stimulation, it is based on cumulative therapy. You need the duty cycle repeatedly operating over time before any effects are felt in the patient. In contrast, the spinal cord stimulation is a constant therapy, and it's meant to have effect almost immediately because its target is actually the spinal cord, whereas with vagal nerve stimulation... Well, it's not a question of, do you do it exactly the same way, but the question is, do you do this, do you have multiple program systems that one would be motivated to use for VNS? I mean, doesn't the techie itself disclose a prior system, a patent with multiple program systems? I don't believe it does, Your Honor, because the PTAB had to rely on Meadows to find multiple... That's what I mean, but the patent does, in its disclosure of prior art, list a system with multiple programs, right? You may be correct on that, Your Honor, but the PTAB found that that element was not disclosed in Ritechi and had to make the combination between Meadows and Ritechi. So the main question today here is whether or not there is a motivation to combine these two references. And as I've been explaining in the key differences between the therapy types, one would not want to take the multiple programs of Meadows and apply them to Ritechi, even though Meadows may have suggested that multiple programs could reduce the number of trips to the doctor's office to update settings, because as in Ritechi, Ritechi, you want the physician to program and you have to wait over time to see what effect that programming is going to have. As our expert explained, it's a cumulative therapy, and when you have cumulative therapy, you don't know the results, whether good or bad, until there's been sufficient time to actually see that effect. But doesn't Meadows disclose different time parameters for purposes of stimulation? Your Honor, technically it has terms for treatment time and for, I think, auto-cycle is the other, but that does not fall within the on and off time parameters claimed in the 307 patent. As the PTAB correctly found, that requires a duty cycle, and in Meadows, those parameters merely indicate the start of a treatment that continues until it ends. It's not a long span during which the on and off constantly flips in a duty cycle as required by the claims of the 307. But doesn't the mere fact that it suggests giving patients control imply that it can be on and off? No, Your Honor. Your Honor, even though it may suggest that it can, the more important issue is whether or not one of ordinary skill would look at that and think, yes, I should. It's not just can, it should. And one of ordinary skill in the art would appreciate that with the vagal nerve stimulation, you want the physician tuning it, because the cumulative therapy means we don't know immediately... have an expectation of success, right? I don't know where you get the should part from. Well, the standard is whether... Yes, you're correct. They would be motivated. They would be motivated and have an expectation of success. Having multiple programs does not indicate to one of ordinary skill in the art that that would be a successful mode of therapy. And that is because you don't want the patient toggling around with all of these things given the sensitivity of the vagal nerve. And Dr. Lye testified that overstimulation of the vagal nerve can permanently damage that nerve and cause serious harm to the patient. That evidence is not disputed by Levonova. So one of ordinary skill in the art would not have made that combination. But notwithstanding that, the PTAB erred because it did not properly credit neuro-cardiac's evidence of secondary considerations of non-obviousness. Most importantly, neuro-cardiac introduced evidence that there was long felt but unresolved need for the invention of the 307 application. And Levonova, during briefing before the PTAB, did not address that point. They exclusively focused on the nexus requirement for commercial success of the invention. And so the only evidence is that there was long felt but unresolved need. And that evidence was a prior application that mentioned multiple prepackaged programs and an external pulse generator. So but the long felt need, the only evidence you have is that six year gap, right? It is the six year gap from the application in 1998 and when the first application, which was neuro-cardiacs, found in 2004. So you're saying you don't point to anything, either expert testimony or data out there saying we're trying to figure this problem out. Nothing outside of Dr. Ladd's statement that there was long felt and unsolved need. You're correct. We do not point to anything in the briefing showing any sort of statistical data or anything of that nature. But I will note that. Did you ever, did you show that any other people had been trying and failing? We did not point to anything specifically beyond the fact that there was a general need for the implantable devices and that is derived from Dr. Ladd's testimony. And additionally, even beyond that, we also have the commercial success of products infringing on the 307 claims. But, you say that, but there has been no determination of infringement, has there? This is just your allegation that it was. Well, correct, Your Honor, and we're not aware of any cases saying that to establish commercial success, you first need a judicial determination of infringement, just evidence of infringement. And in a parallel litigation, neuro-cardiacs submitted infringement claims, mapping, leaving Nova's product to the claims of the 307 patent. So it's, you're saying that there's some indication that their product had success, has had success? Correct, and that comes from Leva Nova's own documentation. I cannot recall the year from which that was, but they reported an increase in sales due to adoption of the Centiva product. And the Centiva product is what neuro-cardiac mapped in their infringement charts. And although a later sentence mentions that Leva Nova also had increased expenses due to direct-to-consumer marketing, that statement was with respect to their neuromodulation. But you don't, in any way, quantify what that success is, right? You just say they had increased sales in Europe and Japan. Correct, we don't put a dollar value on it, and we only have the, sort of, the publicly available evidence that they have published, and if I recall correctly, they had a percentage amount of year-over-year growth, and they attributed it to adoption of the Centiva product, which is what neuro-cardiac has alleged infringes the 307 patent. And going back to the statement about increased costs... Can I just ask, were there other features in the Centiva VNS therapy system, the accused system, that might have been attractive to patients and doctors and whoever else is making  the claims? Your Honor, I don't think there is much information on that point in the record. Would that not have been part of your burden to show a nexus to the specific claim requirements here? Yes, Your Honor, we must show a nexus between the claim and the alleged commercial success, and we did that in submitting Dr. Allad's declaration. He mentioned that he reviewed all of the exhibits to Levanova's petition to the IPR, and that included our infringement charts from the parallel district court litigation. Thus, when he was concluding that there was a nexus between the commercial success of the Centiva product and the 307 patent claims, he was doing so in view of everything that he reviewed, which included those infringement charts. Did he look at anything else relating to the Centiva product, like other features of it, or the advertising that was put in place, or the market that they were tapping into, which was outside of the country? Your Honor, he did not expound upon whether he reviewed any other data outside of the Levanova brochures and literatures that we cited in the record, and items that were part of the petition. So, no, he did not do a full economic analysis or a full analysis of the Centiva product itself. However, he did, obviously, review the infringement chart and link those to the commercial success, which Levanova has admitted is due to adoption of the Centiva product, and in Levanova's briefing, rather, they try to attack that mainly by looking at the fact that they had increased advertising costs, and as I explained, that was not directly advertising costs for the Centiva product, but rather an entire neuromodulation department. Thus, the fact that an increase attributed to the Centiva product specifically shows that it's more than just an increase in advertising dollars, because if that can all be attributed to the increased advertising spend, you would have expected the entire business unit to have seen increased sales, yet they singled out the Centiva product alone. Let me just ask one more question before you're all out of time, but you rely on Dr. Ladd, and you say he said he looked at everything, but he didn't actually go through the infringement chart and express an opinion that there is infringement, did he? Your Honor, he did not go through and write affirmative statements as to each claim element. He doesn't even mention the infringement chart. He just said, I looked at everything. Correct, Your Honor. Okay, thank you. We're saving everybody time. Let's hear from the other side. Mr. Jakes. Good morning. May it please the Court. This is a substantial evidence case. There aren't really any disputed legal issues. The parties aren't challenging claim construction. The only question is, was there substantial evidence to support the Board's findings? And here, in the Board's very thorough opinion, there was more than enough evidence to conclude that the claims would have been obvious. What about the fact that stimulating vagus nerve is very different than stimulating muscles, right? I mean, it can be dangerous. No, Your Honor. I don't agree it's very different. They use the same pulse generator. And the SCS system, the spinal cord system, it's stimulating a nerve as well. It talks about neural stimulation. These devices, they're not really all that different than pacemakers. They supply a chain of pulses to whatever. But the expert testimony was that, with respect to vagus nerve, you have to be very careful that the stimulation is carefully controlled, right? That's true, yes. And there's no disagreement about that. But that doesn't mean that the patient can't have some control to change parameters. In fact, that's what Levonova's product does. That's the product that it does today. And so the suggestion that you wouldn't have multiple programs with some limited patient control because it would be dangerous, well, of course, those are very contained parameters that the doctor gives the patient control over, such as increase the stimulation or increase the frequency. Those programs, I mean, they obviously work. They are working today. So the idea that it would have been dangerous because you wouldn't ever want to put multiple programs into a device. Of course, you're asking us to just engage in hindsight here. We figured it out later, six years later, so therefore it must have been something everybody would have thought to do. I think the teaching in Meadows is enough. There's a direct express suggestion that that system could be used with various types of neural stimulation systems. And there's nothing in there that says don't use this with the vagus nerve. When you say there's a direct statement, it says various stimulation systems. So they list several. Where does vagus nerve fall in that list? It's a neural stimulation system. It's stimulating a nerve, and that is exactly what happens. Now the other point in Meadows, it also says that it could be used with single electrodes as opposed to multiple electrodes. Well, the vagus nerve system is a single electrode system, and so the differences you would have between stimulating the spinal cord and the vagus nerve, it already accounts for that. So these programs, they're not that different. There's nothing that says the frequency, amplitude, these parameters are so different that you wouldn't apply one to the other. They have to be set for the particular application, but that's directly what Meadows says. I mean, the teaching of Meadows, the whole patent is directed to multiple programs, and that's really the only difference from the Rutecky system, which is a vagus nerve system, and what is claimed here. And I think Your Honor recognized even in Rutecky, it does cite to an earlier patent that also suggests some patient control in terms of frequency and amplitude for vagus nerve stimulation. That's that earlier Baker patent. So what we're left here with is factual findings by the board that there was a motivation to combine. We have Dr. Miron's very lengthy declaration, which goes into all those reasons. The board looked at those reasons, found for multiple reasons there would be a motivation to combine, the similarities between the systems. Primarily, motivation would be for the very same reason that Meadows teaches, multiple programs, so that the patient could have some control without having to go to the doctor every time to reprogram it, and that these systems were not so different that they couldn't be combined. Now, the other side made an argument throughout their briefs that the board found they could be combined, but not that they would. Of course, the board said would on multiple instances in its opinion. In saying that the teachings could be combined, the court was addressing Neuro's argument that they were incompatible and that they would somehow never be combined. The board said, no, it's really not that big of a leap. In fact, both experts agreed that it would require only minimal changes to the actual devices in order to combine. Can you remind me, what did your expert say on the specific question, whether for vagus nerve stimulation doctors would not want to place multiple options in the patient's hands? I don't think our expert said that, no. No, that's kind of their point. What's that? I think that that was their argument. The question is, what did your expert say in response to that? I'm not sure that our expert did respond to that. Our expert did go through all the reasons there was a reason to combine them, and that, in fact, the difference was they were compatible. They could be combined, and the notion that they would be somehow dangerous, I don't remember if that was specifically addressed by our expert. On the secondary considerations, there's really, if you look at what was submitted, there is barely anything there. On the long-felt need, there is an earlier patent by the same inventor that discloses everything, except it's an external device. It's vagus nerve stimulation. It also has multiple programs. That's somewhat contrary. Would I be correct in thinking that the patient could abuse that one, too? It's just that it's not inside the body, it's outside the body? Yes, it was external, yes, and it also teaches multiple programs, but it was an external device. The only difference was that it wasn't implantable, and if you look at the gap, whether it's six years or less, I think that patent issued in 2001, and they filed their next application the next year. They're running from the application date of the first patent. Sure, but it wasn't publicly known. It was several years before, and for a long-felt need, there has to be something generally recognized that this is a problem. I mean, that's what you look for, not just that nobody did it, and that's why the passage of time is not enough, because that's just the argument that, well, during this time, nobody did it. There has to be a recognition of the problem, and usually somebody tried to solve it, and they were having difficulty with it. So there's no real evidence to support that. Their expert did say, well, I think there's a long-felt need, but there's really nothing to back that up. What is the difference between your affirmative motivation evidence that skilled artisans would have recognized there would be a benefit to patient control, reduced number of visits to the doctor, and so on, and a recognition of the problem? And a recognition of the problem? Why doesn't your own evidence of recognized benefit from doing this constitute evidence of recognition of a problem that took not very long time, but let's stipulate it was a long time for purposes of this question to solve? Well, certainly there was a reason to combine them. If I follow your logic, I think anywhere there's a motivation to combine, there would be a long-felt need. I don't think that's quite right. Well, it would depend on how long. That's right. I suppose it would. But most inventions do try to solve some need, and where there's a motivation to combine, if there is a reason, I don't think that implies a long-felt need. It could be something that nobody ever thought was needed, but it was suggested by the prior art, and there was a reason to do it, and that would still satisfy it. On commercial success, what we have is there are experts, basically two sentences, one saying our product was a commercial success. Your product is a commercial success? Well, not in the sense that you'd have to have to prove this. It's a catch-22 there, isn't it? Is it a commercial success or is it not? It's a successful product. There's no doubt about that. But when you say there's commercial success, that implies there's something that goes with that in this context, and that's why simply saying a product is successful is not enough to show commercial success for purposes of secondary consideration. So what else would they have had to show other than assuming your product infringes the patent? What would they have had to show other than the fact that your product is a commercial success? Well, they'd have to show what that commercial success was. There's no quantification. Did it replace an earlier product? Is that where the sales came from? That's generally not a commercial success. If all you're doing is having an updated product, they would have to show, of course, a nexus, that any increase that would have to be something more than minimal was— Well, this was a new product, right? Well, yes, but it was replacing an existing product, yes. It was a product that wasn't programmable, right? It was programmable by the doctor, yes. Right, but not by the patient. That's the whole point. There weren't multiple programs. Yes, they introduced the feature of multiple programs in 27 or 28 years. Which is the whole invention that's disclosed in the patent, right? Well, that's the invention that's disclosed in Meadows as well from 1998, so yes, multiple programs. They did introduce that feature. Well, they did show that it did something that prior products didn't do. Isn't that correct? That's true, yes. The product was different than its earlier product, and as I think there wasn't any showing that there weren't additional features in this new product that could have had something to do with that. What we're left with is one statement in the Leonovus 10Q that says, Sales of this year were better than last year. We introduced this new product. And then the following sentence, it also talks about increased sales and marketing expenses that had kept some of that income down. That's pretty weak. I mean, without any more, I don't think this court had said that's the kind of evidence you need for commercial success to overcome what is a strong case of obviousness in any event. The board looked at that and said, look, we'll accept there's a nexus here. It's not enough. You say it's overwhelming. We don't see it. It doesn't overcome this case of obviousness in any event. On the nexus question, we did challenge the nexus. What they have in their expert's declaration is one sentence. There is a nexus. This court's case on nexuses is pretty extensive about what needs to be done and a bare statement that there is a nexus isn't enough. Whether or not their claims cover our product, we've obviously disputed that in the litigation. What was attached was a claim chart that were their contentions. There was no evidence. The expert didn't swear to that. He didn't say, I looked at the product. I believe it infringes. It's attorney argument. It's any contentions that are submitted in a district court case. We actually submitted it with our petition for the purpose of showing what claim constructions that they were proposing. That on itself just attached to our petition. That's not evidence. That's just their arguments that they made. Their suggestion, well, their expert looked at everything. He didn't say that.  If that's enough, the threshold for commercial success and nexus will be so low that it will take virtually nothing for someone to assert that. Just remind me, what evidence did you submit in answer to the assertion of commercial success? We argued that they hadn't proved nexus. An argument. Attorney argument. Yes. We didn't submit anything alternatively. It was their burden to put forth that evidence, and we didn't think they had made the showing. The board agreed with us, made those findings that they hadn't produced enough evidence. And that brings us back. That's why this is a substantial evidence case. There was more than enough evidence to support the board's findings on motivation to combine and rejecting the secondary considerations. Their expert may have said something different, but that's not the standard. The board found more than these references could have been combined. But a person of ordinary skill in the art would have combined them for the very reason that was given in Meadows. Thank you. Thank you. Mr. Branstad?  Thank you. Just a few brief points. While our expert, Dr. Ladd, never specifically said that he looked at the infringement contentions, Appendix 43-42, there's a discussion where, during the PTAP proceedings, our expert claimed that he reviewed all of the exhibits, and that exhibit included those infringement contentions. So he's not pulling this stuff out of thin air. He did review those contentions. He did consider them. And then he made the conclusion that there was a nexus between the alleged infringement and the commercial success of the Centiva product. Furthermore, whether or not the Centiva product has shown that it's possible to use the multiple prepackaged programs in the vagal nerve stimulation is not relevant, because we must look back to the time of these prior art references to determine whether or not one of ordinary skill in the art would have had the expectation that it would have been safe. And the evidence does not show that. All of the evidence shows that there is danger in overstimulating the vagal nerve, and Levonova's expert agrees that overstimulation is dangerous. Therefore, one of ordinary skill in the art would not have made that combination. And finally, yes, this is a substantial evidence standard of review with all these factual issues, but at least on the point of long-felt and unsolved need. The only evidence on that point was that there was long-felt and unsolved need. There was evidence that multiple prepackaged programs might be useful in the vagal nerve setting in sort of the prior reference that one of the inventors of the 307 patent filed, and the fact that there was a six-year gap between when that came out and when any of these implantable pulse-generating vagal nerve stimulators were actually released is evidence of non-obviousness. If there are no further questions, we will see the rest of our time. Thank you. Thank you. Thanks to both counsels. The case is taken under submission. Okay. Thank you.